A. V. BAMFORD, Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

No. 75–1309.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 25, 1975.

Decided March 29, 1976.

Rehearing Denied May 6, 1976.

Lauren A. Colby, Washington, D. C., for appellant.

Stephen A. Sharp, Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel and Daniel M. Armstrong, Acting Associate Gen. Counsel, F. C. C., Washington, D. C., were on the brief for appellee.

Before DANAHER, Senior Circuit Judge, LEVENTHAL, Circuit Judge, and VAN PELT,* United States Senior District Judge for the District of Nebraska.

Opinion for the Court filed by Senior Circuit Judge DANAHER.

Dissenting opinion filed by Senior District Judge VAN PELT.

DANAHER, Senior Circuit Judge:

This is an appeal pursuant to 47 U.S.C. § 402(b)(1) from a decision of the Review Board of the Federal Communications Commission (Board)[1] denying petitioner Bamford's application for a construction permit[2] for a *new* FM broadcast facility in Corpus Christi, Texas. 48 FCC 2d 1155 (1974). The denial was based solely on a finding of failure to comply with the Com-

mission's *Primer on Ascertainment of Community Problems by Broadcast Applicants,* 27 FCC 2d 650 (1971). In so holding, the Board reversed the Initial Decision entered by the Administrative Law Judge (ALJ) who had only grudgingly approved issuance of the permit on a finding of "minimal" compliance with the Primer, despite a fragmented presentation characterized as "haphazard in the extreme." 48 FCC 2d 1161 (1974). Petitioner urges reversal essentially on a claim of vagueness of certain Primer standards resulting in a lack of notice, but additionally he argues that the Board erred in refusing to allow him to amend his application. After careful review of the materials of record as pertinent here, we affirm the decision of the Commission.

## I. BACKGROUND

As part of its mandate to regulate the broadcasting industry in the public interest,[3] the FCC has required applicants to familiarize themselves with the needs, interests and problems of the groups comprising the communities proposed to be served, to document such familiarity in license applications, and to submit programming proposals responsive to such needs. The primary purpose of this requirement is to guarantee

> that the programming service will be rooted in people whom the station is obligated to serve and who will be in a much better position to see that the obligation to them is fulfilled, thus lessening the enforcement burden of the Commission.

"Public Notice Relating To Ascertainment of Community Needs by Broadcast Appli-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The Commission denied review of the Board's decision on February 25, 1975, thereby giving it the force and effect of a Commission decision. 47 U.S.C. § 155(d)(3).

2. A construction permit is a prerequisite to the issuance of a new station license and, "except in rare [instances], it is also a guarantee of a license to operate the station once constructed." *Fidelity Television Inc. v. F. C. C.,* 169

U.S.App.D.C. 225, 229, 515 F.2d 684, 688 n. 2 (1975). Because of the importance attached to a construction permit determination, a particularly heavy burden is placed on both the applicant and the Commission to establish that issuance of the permit will comport with the public interest.

3. 47 U.S.C. §§ 307(a), (d), and 309(a); *see, Henry v. F. C. C.,* 112 U.S.App.D.C. 257, 302 F.2d 191, *cert. denied,* 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 60 (1962).

cants," FCC 68–847, 13 R.R.2d 1903 (1968). The requirement has evolved gradually, beginning with the Commission's *En Banc Programming Inquiry*, FCC 60–970, 20 R.R. 1901 (1960),[4] and continuing, with some confusion,[5] to the present time. *See Ascertainment of Community Problems by Broadcast [Renewal] Applicants*, 41 Fed.Reg. 1371 (January 7, 1976). The importance of the requirement was reflected in the Commission's landmark decision in *City of Camden et al.*, 18 FCC 2d 412 (1969), where it refused to approve the voluntary assignment of a station license because of the failure of the assignee adequately to survey the community sought to be served. The issuance of the *Camden* decision was followed by a flurry of activity at the Commission, and in December 1969 the Commission issued a Notice of Inquiry on the ascertainment standards and published a proposed Primer designed to answer requests for clarification submitted by applicants and the Federal Communications Bar Association. 20 FCC 2d 880. Shortly thereafter, the Commission published an "Interim Procedure" which had the effect, among other things, of staying all pending proceedings until the Primer was issued in final form. *Community Survey Showings—Interim Procedure*, 22 FCC 2d 421 (1970). The Primer and an accompanying detailed Report were formally promulgated on February 23, 1971, and pending proceedings were finally allowed to go forward with an opportunity being allowed for applicants to revise community ascertainment showings in order to comport with the standards set forth in the Primer. 27 FCC 2d 650.

The Primer established a relatively detailed set of guidelines for applicants to follow, each applicant thereafter being bound to provide the Commission with detailed information on certain required steps,

and thus indicating a genuine awareness of problems in the areas sought to be served. Accordingly as presently pertinent, the Commission required each applicant to: (1) undertake a compositional study of the area designed to determine "significant groups" therein; (2) seek out and interview "leaders" or "spokesmen" for each such group to determine their perception of local needs and problems; (3) conduct a "roughly random" survey of the general public's perception of such needs and problems; (4) evaluate the problems thus uncovered; and (5) submit programming proposals designed to assist in the resolution of these problems.

Petitioner submitted his application for a construction permit on January 20, 1970, in the midst of the confusion which preceded publication of the Primer. The application was designated for hearing on certain issues, including the community survey issue, on November 18, 1970, but was postponed at the request of petitioner's counsel pending publication of the Primer. The Primer was released on February 23, 1971, and in May of that year petitioner conducted a series of interviews designed to comply with the Primer and submitted the results in an amendment to the application filed on June 7, 1971. Hearings were then held in September, and as a result petitioner conducted an additional survey in October, supplemented it in December, and filed the results as a second amendment to the application. Following a hearing on the new survey, the record was closed on January 27, 1972.

As a result of these survey showings, Bamford could demonstrate interviews with 45 community leaders, drawn primarily from a broad base of civic and business organizations, J.A. 68, 48 FCC 2d at 1167. He could additionally show interviews with

---

**4.** There it was stressed that the Commission "does expect its broadcast licensees to take the necessary steps to inform themselves of the real needs and interests of the areas they serve, and to provide programming which in fact constitutes a diligent effort, in good faith, to provide for those needs and interests."

20 R.R. at 1913.

**5.** At one point the Commission was constrained to recognize "that there is wide disagreement over the details that should be required of an applicant in reporting on ascertainment of community needs and interests." *AM & FM Program Form*, 1 FCC 2d 439, 442 (1965).

23 members of the general public,[6] and the receipt of reply post card questionnaires from 50 additional members of the general public.

The non-ascertainment issues involved in the Corpus Christi application were severed at the request of the Commission Staff, 31 FCC 2d 701 (1971), and consolidated for hearing with similar issues in another proceeding involving petitioner's application for a broadcast station in Colorado. 32 FCC 2d 773 (1972). The Corpus Christi proceeding remained dormant until the consolidated Colorado hearing was resolved favorably for the petitioner on June 16, 1973. 41 FCC 2d 835. Thereupon, the Administrative Law Judge reactivated the Corpus Christi proceeding and established a date for the filing of proposed findings. In the meantime petitioner conducted a new survey of the area in October 1973, and attempted to reopen the record for submission of the new results. The ALJ denied this request, but, concluding that Bamford had minimally achieved essential compliance, he released his initial decision on February 15, 1974, and granted the application.

The Commission Staff appealed the ruling to the Review Board which, after hearing oral argument, rendered a decision reversing the ALJ and denying the application. Petitioner then appealed to the Commission which declined review, thus finalizing the Review Board's determination. The Board found that petitioner had presented an inadequate survey of community problems: he had failed to undertake an adequate compositional survey of the Corpus Christi area; he had failed to interview "leaders" of significant groups in the city, specifically Spanish-Americans and welfare recipients; and he had failed to conduct a "random" survey of the general public.[7]

## II. THE ISSUES ON APPEAL

As a preliminary matter, we note that whatever other factors may have contributed to the haphazard ascertainment showing involved here, certainly the inadequacy of the composition study played a direct role. The composition study serves as the basis for the survey of "leaders" of significant groups, and is therefore a crucial component of a community needs survey.[8]

Petitioner's composition study was in two parts. The first, submitted with the May 1971 amendment, consisted of a copy of a single page from the 1970 Census containing information on race, age, and head of household status for the population of Corpus Christi. The second, submitted with the October 1971 survey, contained a list of service, professional and trade organizations in the area, as well as information concerning the industrial life of the city and a general description of the nature of its work force. No information was submitted detailing the income distribution in the area. Had such information been obtained, petitioner would have been aware that over

---

6. These 23 individuals, included in the May 1971 survey, were determined to be "de facto" members of the general public after Bamford failed to designate them as community leaders.

7. The 23 members of the general public, see n. 6, were found to be not randomly selected and, thus, this aspect of the general public survey was not in compliance with the Primer. The results of the mail survey were disallowed since the Primer proscribes the use of survey techniques which "require the interviewee's voluntary return of the questionnaire by mail." ¶ 46 of the Primer, J.A. 9, 27 FCC 2d at 668. Such findings were clearly appropriate.

8. The Answer to Question 10 of the Primer states in pertinent part:

The purpose of requiring a determination of the community is to inform the applicant and the Commission what groups constitute the community. The applicant must use that information to select those who are to be consulted as representatives of these groups. That determination may be challenged on a showing, including supporting data, that a significant group has been omitted."

J.A. 14, 27 FCC 2d at 683. The Commission does not demand that an applicant undertake an independent sociological study of the area, but rather that he

"submit such data as is necessary to indicate the minority, or ethnic breakdown of the community, its economic activities, government activities, public service organizations, and any other factors or activities that make the particular community distinctive."

Id. This information may be obtained from the U.S. Census Bureau, the local Chamber of Commerce, or other reliable sources.

18 per cent of the population of the Corpus Christi area was below the poverty level.

## A. The Leadership Survey

Bamford charges that the Primer provided him with insufficient notice of certain requirements concerning the leadership survey. He claims that the Primer did not inform him that the term "leader" referred only to a person holding an official position in an organization, and that it did not indicate that welfare recipients were embraced within the phrase "significant group."

█ It is beyond dispute that an applicant should not be placed in the position of going forward with an application without knowledge of requirements established by the Commission, and elementary fairness requires clarity of standards sufficient to apprise an applicant of what is expected. As Judge Leventhal stated in *Radio Athens, Inc., (WATH) v. F. C. C.*, 130 U.S.App.D.C. 333, 339, 401 F.2d 398, 404 (1968) (dismissal of application without hearing for patent non-conformance with Commission rules):

"The Commission is entitled to expect good faith on the part of the broadcasting industry in supplying data requested. The industry is correspondingly entitled to expect rules defining the required content of applications that are *reasonably*

*comprehensible to men acting in good faith.*" (emphasis added) (footnote omitted).

If an applicant ignores or fails to understand "reasonably comprehensible" requirements, he cannot be heard to complain about lack of notice.[9]

█ The Review Board found that Bamford had failed to interview "leaders" of the Spanish-American population group in Corpus Christi,[10] and that "[t]his deficiency standing alone, is sufficient basis" for the denial of the application. J.A. 76, 48 FCC 2d at 1158. The Commission thereby discounted petitioner's interviews with four Spanish-Americans holding prominent positions in the Corpus Christi community—a judge, a city councilman, a pastor of a Roman Catholic Mexican-American church, and the county clerk who was also president of the Knights of Columbus—holding that these individuals were not "leaders" of the Spanish-American community. While the Board does not clearly indicate its reasoning, it appears that it defined "leader" in this instance as one who heads a formal "group" organized for the purpose of advancing the cause of a special interest or of an ethnic or nationality group.[11] Petitioner, on the other hand, believed—or at least his actions indicate that he believed—that a

---

**9.** *Cf., Ranger v. F. C. C.*, 111 U.S.App.D.C. 44, 46, 294 F.2d 240, 242 (1961), where the court said:

"We think an applicant for a radio license who either ignores or fails to understand clear and valid rules of the Commission respecting the requirements for an application assumes the risk that the application will not be acceptable for filing."

**10.** It is conceded that the Spanish-American population of Corpus Christi constitutes a "significant group." Neither compositional study submitted by petitioner indicated the size of this group. Bamford at first estimated that Spanish-Americans constituted 48 per cent of the population, but later modified that figure to 35.7 per cent after consulting with the Corpus Christi Chamber of Commerce.

**11.** The language employed by the Board is less than clear. The Board stated that "none of the four Spanish-Americans interviewed . . . were shown to be leaders of this community (or even necessarily representative thereof)." J.A. 76, 48 FCC 2d at 1158. Thus it is not clear

whether the Board views "representativeness" as a quality severable from that of leadership. In a footnote to the above quoted statement, the Board noted:

"In this connection, it is noteworthy that even though 35.7% of the Corpus Christi population is Spanish-American, Bamford was unable to locate leaders of representative organizations. The Commission has specifically addressed itself to this difficulty, stating, since ' . . . an applicant may not arbitrarily avoid personal consultations with significant groups because the group lacks a highly developed formal structure, we believe that it is appropriate to [advise] . . . that additional efforts may be needed to identify leaders of less organized groups.' 27 FCC 2d 650, 666, 21 RR 2d 1507." 48 FCC 2d at 1158 n. 16.

The Board's reliance on this language from the Primer appears to be misplaced, since the language is by its terms not directed at resolving problems of determining who are leaders, but rather at resolving problems of ignoring less

"leader" is one who holds a traditional position of authority and respect within the general community and who also happens to be a member of the "target" ethnic or racial group. Such a view appears to have been based on the notion that when a member of a minority group achieves a position of prominence—such as a judge or an elected official—that person automatically becomes a spokesman for, or a representative of, the minority group. While this expression may represent a somewhat outdated concept, we cannot say that it is patently invalid, nor can we find any language in the Primer which reasonably can be said to proscribe it. Indeed, at no point does the Primer make any effort to provide a specific definition of "leader"; rather, it appears that the term was taken for granted. The construction adopted by the Board, when properly supported, may well be a permissible ruling, but it is not one to be applied without prior notice.

■ Even so, reversal and remand are not called for here since the Board additionally found that petitioner had totally failed to include in the survey of community leaders—however defined—any person in a position to bespeak the interests of the poor. J.A. 76, 48 FCC 2d at 1168. Although this finding is strenuously opposed by counsel for petitioner, we find that his objections are without merit and that the Board's finding presents an independent basis for its denial of the application. The Board noted that 18.4 per cent of the families in

the Corpus Christi area were below the poverty level, and accordingly found that the poor constituted a significant group. The Primer provides that failure to include a significant group in the community leader survey "would make the applicant's showing defective, since those consulted would not reflect the composition of the community." J.A. 15, 27 FCC 2d at 684.

Petitioner now claims that this finding was lacking in fairness because it amounted to an unwarranted addition to the list of groups "required" to be contacted by an applicant, and that, therefore, he was without notice. This contention is without merit. Initially, we note that there is no such thing as a "required" list of groups to be consulted. The Primer assiduously avoids such rigidity in the recognition that communities differ in their composition.[12]

In some situations, not present here, there could be at least some plausibility in a submission that the guidelines are too broad and vague respecting just what constitutes a "significant" group. The word "group", as used in the Primer, is "broad enough to include population segments, such as racial and ethnic groups, and informal groups, as well as groups with formal organization." J.A. 14, 27 FCC 2d at 682. The determination of the "significance" of the group, which triggers the need for a leadership survey, "may rest on several criteria, including its size, its influence, or its lack of influence in the community." J.A. 14, 27 FCC 2d at 683.

organized groupings precisely because of the lack of a well defined organizational structure.

12. Counsel would have us construe the following portion of the Primer as establishing an exclusive listing of significant groups:

"10. Question: If the applicant shows consultations with leaders of groups and organizations that represent various economic, social, political, cultural *and other elements* of the community, *such as* government, education, religion, agriculture, business, labor, the professions, racial and/or ethnic groups, and eleemosynary organizations, is the applicant still required to submit a showing in support of its determination of the composition of the community?

Answer: Yes. The purpose of requiring a determination of the community is to inform

the applicant and the Commission what groups comprise the community. The applicant must use that information to select those who are to be consulted as representatives of those groups. That determination may be challenged on a showing, including supporting data, that a significant group has been omitted. The 'significance' of a group may rest on several criteria, including its size, its influence or its lack of influence in the community."

J.A. 14, 27 FCC 2d at 683. (Emphasis added). Clearly the italicized language of the quoted material indicates the Commission's intent to have the "list" of "groups and organizations" function in an illustrative capacity only.

In the particular circumstances of this case, however, petitioner's claim of lack of notice must fail, for we find that there are sufficient references to the specific group found to be unrepresented in petitioner's survey in the Report which accompanied the publication of the Primer and also in pre-Primer Commission precedent.[13] The

13. Counsel for petitioner suggested at oral argument that the Report should not be considered determinative because it did not constitute an integral part of the Primer. This suggestion is patently without merit.

14. In the Report's response to the various comments submitted by interested parties, the following explanation was given:

"The Citizens Committee suggests that an applicant's obligation does not end with 'establishment' leaders, and includes 'voluntary associations and agencies dealing with the needs of the elderly, the *indigent* and the handicapped, with *welfare associations*, tenant groups, youth and student groups, property owners associations and other groups organized for the express purpose of protecting particular needs and interests.' *The question is whether those groups comprise a significant segment of the community*, not whether they fall within or without the 'establishment', however that word is defined. Leaders of the listed organizations should be consulted, if they represent a significant group within the particular community. Since all these groups or organizations listed by the Citizens Committee will not necessarily appear in all communities, it would be inappropriate to set them forth in a Primer that is generally applicable."

¶ 31, J.A. 7, 27 FCC 2d at 662–663. (Emphasis added). While the Commission recognized the difficulty of identifying "leaders" of the groups lacking a highly developed formal structure, *see* Question and Answer 13(a) of the Primer and relevant discussion in ¶ 39, J.A. 8, 27 FCC 2d at 666, it nevertheless required that they be sought out in the leadership survey. As an aid in assessing compliance, the Commission required the leader to be identified "by name, position and/or organization." Answer 20. To provide further guidance, the Report gave the following examples:

". . . John Jones, Executive Vice-President, XYZ Corporation, would be an appropriate identification for a business leader. John Jones, 123 First Street, *spokesman for welfare recipients*, would be an appropriate identification for a leader of a group lacking a high degree of formal organization."

¶ 52, J.A. 10, 27 FCC 2d at 671. (Emphasis added).

Commission on several occasions in the Report indicated its concern for the needs and problems confronted by the poor and welfare recipients. Clearly evinced was an intent to require "leadership surveys" in instances where the poor constitute a significant population grouping.[14] Such an intent can also be found in FCC decisions issued *prior* to development of the Primer.[15] Un-

14. Additionally the Commission gave rather extensive consideration to the problems of the poor in the context of discussing the ultimate purpose of the ascertainment guidelines—programming which responds to the problems of the community. Following publication of the proposed Primer, a comment was received from the National Association of Broadcasters, Inc., (NAB), which suggested that the dominant format of the broadcaster should determine which problems should be addressed in the programming proposals; for example, a "rock" station would be most effective in treating problems germane to a predominantly young audience. This proposal was rejected by the FCC with the following explanation:

"Under the rationale of the NAB, since welfare programs are 'germane' to the poor, two of the stations in the city might ignore or only minimally treat these problems for the reason that their audiences have relatively few poor people. That is an undesirable result. We do not accept the thesis that all those who might be eligible for the welfare programs do not listen to popular, 'rock' or classical music. Moreover, the inadequacy of the city's welfare program might well be a topic of news, discussion, and editorials on all three stations. However, we believe the applicant's knowledge of his audience may properly be used in the following manner. The station with an audience that has a large proportion of poor people might emphasize the services available, the criteria for eligibility, and locations where those who are eligible should call or go to avail themselves of the services. The 'rock' station might emphasize the need for volunteers while the popular station might emphasize the need for volunteers and for contributions to the program sponsored by the eleemosynary organization. These are offered only as possible ways of meeting a community problem. Innovative broadcasters would, no doubt, have different points of emphasis or other means of meeting the problems."

¶ 58, J.A. 10–11, 27 FCC 2d at 673. *See also,* ¶ 17, J.A. 4, 27 FCC 2d at 656.

15. For example, this concern was expressed by the Commission in the important decision *City of Camden et al.,* 18 F.C.C.2d 412 (1969). There the Commission denied the application

der these circumstances, we believe that adequate notice was provided petitioner that should the poor constitute a significant group in Corpus Christi he was required to consult with their "leaders" or "representatives". Moreover, we believe that the Review Board's determination that a group constituting nearly twenty per cent of an area's population is significant was justified. Under the terms of the Primer the application was properly denied because of this "deficient" ascertainment showing.[16] It was petitioner's *failure to show* consultation with anyone arguably bespeaking the interests of Corpus Christi's poor, *and* his claim that such consultations were *not required* by the Primer which lead us to this conclusion. Therefore, the problems we address with reference to the survey of Spanish-American "leaders" are not present.

## B. *The Petition for Amendment*

■ A closer question is presented in petitioner's claim that the Commission im-

properly denied his request to reopen the record for submission of a new ascertainment survey conducted in October 1973. It will be recalled that the survey materials contained in the record were two years old at the time of the request because of a Commission-imposed dormacy in the Corpus Christi proceeding. *See*, 32 FCC 2d 773 (1972); 31 FCC 2d 701 (1971). The Corpus Christi proceeding was free to move forward after July 16, 1973, 41 FCC 2d 835, and following conference with counsel, the ALJ set November 19, 1973, as the date for the filing of proposed findings. On November 12 counsel for Bamford requested a postponement of the filing date and a reopening of the record to allow submission of a new survey of community needs conducted sometime in October. The purported justification for this request was an asserted "on-going ascertainment" requirement of the Primer, and a need to overcome "the potentially disqualifying community needs issue." [17] The ALJ denied the petition on

of the City of Camden, New Jersey, and the McLendon Corporation for approval of the voluntary assignment of a station license from the city to the corporation, finding that the proposed programming was designed more for Philadelphia than for Camden, the city of license. The Commission based its holding, in part, on an inadequate demographic study of Camden and a failure to contact, among others, representatives of the poor. 18 FCC 2d at 422. The Commission found that the proposed programming reflected the lack of depth in determining the needs of the community. *Id.* More importantly for our purposes, it found that the station was

" . . . of particular significance to the economically disadvantaged in Camden, and possibly the cheapest and most effective way of bringing to the attention of such groups matters of interest to them, such as job-training programs, education programs, bus schedules, where unemployment compensation can be obtained, how one goes about getting food if he cannot feed his family, available medical or clinical service, what is happening in the immediate neighborhood, the meetings that are being held, and the opportunities to participate in elections. Indeed, a radio station to an important extent actually helps define the citizen's sense of community and thus builds his feeling of participation in—or exclusion from—community affairs. *Yet there is no clear evidence that the McLendons sought to explore and evaluate the pressing needs of the economically*

*disadvantaged in Camden in developing programming proposals.* This is an example of the superficiality we find in the applicant's proposal."
*Id.* at 423. (Emphasis added).

**16.** The Answer to Question 16 of the Primer states: "The omission of consultations with leaders of a significant group would make the applicant's showing *defective*, since those consulted would not reflect the composition of the community." J.A. 15, 27 FCC 2d at 684. (Emphasis added). This language was substituted for that contained in the proposed Primer, 20 FCC 2d 800 (1969), which merely stated that the ascertainment process was "subject to question", and thus represented a significant increase in the sanction imposed. *See generally*, ¶ 44, J.A. 9, 27 FCC 2d at 668; *Voice of Dixie, Inc.*, 45 FCC 2d 1027, 1029–1030, *recon. denied*, 47 FCC 2d 526 (1974).

**17.** J.A. 58. The full justification, as set forth in the ALJ's order of denial, was as follows:

"2. Acceptance of this amendment is respectfully requested. The taking of a supplemental survey to up-date the previous data— the most recent of which is now two years old—is both justified and required by the so-called 'on-going ascertainment' requirements of the Primer. The acceptance of the amendment should not delay the proceeding more than a few weeks at most, and will ensure that Bamford overcomes the poten-

the ground that Bamford had failed to show good cause as required by Section 1.522(b) of the Commission's rules.[18] Ten days later the ALJ denied a Petition for Reconsideration of those parts of the previous Order relating to the new survey, but granted the requested extension of time within which to file proposed findings. J.A. 60. The orders of the ALJ are far from being models of clarity, yet they allow for sufficient insight into the reasons for denial. *Cf., Greater Boston Television Corporation v. F. C. C.*, 143 U.S.App.D.C. 383, 392–395, 444 F.2d 841, 850–853 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). The claim of an on-going ascertainment requirement for a *non-renewal* applicant was rejected by the ALJ, and properly so since no such requirement exists in the Primer. We are constrained to state, however, that if the sole, or even primary, reason for the proposed amendment had been the need to update the old surveys so as accurately to present a current assessment of the community's problems, we could not agree with the determination. The purpose of the ascertainment survey is to make the broadcaster aware of, and responsive to, community problems. Undoubtedly problems and needs change over a period of time, and if the survey and proposed responsive programming requirements are to have any meaning, they must be reasonably current—otherwise the survey becomes a fruitless exaltation of form over substance.

■ However, as we read the record, it appears to us that the ALJ concluded that petitioner was merely attempting to overcome the blatant deficiencies of the previous ascertainment efforts. Petitioner had candidly admitted in the petition that he was concerned over the "potentially disqualifying" ascertainment issues, and had re-emphasized this concern in his Petition for Reconsideration.[19] Had this been petitioner's first attempt to reopen the record following publication of the Primer, a different situation would be present. 27 FCC 2d at 680; *see also, Risner Broadcasting Inc.*, 28 FCC 2d 330 (1971); *cf., Sioux Empire Broadcasting Co.*, 16 FCC 2d 995 (1969). It was his *third* attempt, however, and under such circumstances we believe the denial was permissible.[20]

*Judgment accordingly.*

VAN PELT, Senior District Judge (dissenting).

I respectfully dissent from the excellently written majority opinion which accurately reflects the issues and the evidence.

I cannot subscribe to the finding of the Review Board that Bamford had failed to interview leaders of the Spanish-American population group at Corpus Christi. The four Spanish-Americans interviewed, as shown by the majority opinion are "a judge, a city councilman, a pastor of a Roman Catholic Mexican-American church, and the county clerk who was also president of the Knights of Columbus." I am unable to believe in a community in which Spanish-Americans constitute 35.7% to 48% of the population (see note 10, majority opinion) that for a Spanish-American to be elected a judge, city councilman, or a county clerk is

tially disqualifying community needs issue and is able, therefore, to start rendering a new service to the public at the earliest possible date. Good cause exists, therefore, for this amendment."

18.  47 C.F.R. 1.522(b) provides in relevant part: "Requests to amend an application after it has been designated for hearing . . . will be granted only for good cause shown."

19.  The ALJ noted that "Bamford's counsel merely assumes the responsibility for prior deficiencies which he says should not be imputed to Bamford." J.A. 60.

20.  We cannot ignore the Commission's duty to make certain that the public convenience, interest and necessity will be served when a new construction permit is sought. *See* n. 2, *supra*. In the highly technical area under consideration here, we surely are bound to accord great deference to the Commission's construction and administration of its own regulations in meeting essential statutory requirements. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961).

not prima facie evidence of his or her leadership. As to the approximately 18% of the population who are below the poverty level, I would feel critical of any survey of a poverty group in such a community which did not include a conference with a priest of a Roman Catholic Mexican-American church. I am not a member of that religious group but my experience teaches me that almost uniformly Catholic priests are well informed as to the poverty needs of their community.

I would sustain the petitioner's request to reopen the record for the submission of new survey material.