10 F.3d 892
 304 U.S.App.D.C. 117
 SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
MCI Telecommunications Corporation; American Telephone and
Telegraph Company, Intervenors.
 No. 93-1202.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 9, 1993.
Decided Dec. 17, 1993.
 
 [304 U.S.App.D.C. 118] Petition for Review of an Order of the Federal Communications Commission.
 John I. Stewart, Jr., Washington, DC, argued the cause for petitioner. With him on the briefs were Jennifer N. Waters, Washington, DC, Martin E. Grambow, James E. Taylor, Richard C. Hartgrove and Thomas A. Pajda, St. Louis, MO.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, DC, argued the cause for respondents. With him on the brief were Renee Licht, Acting Gen. Counsel, F.C.C., Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and James M. Carr, Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., U.S. Dept. of Justice, Catherine G. O'Sullivan and Robert J. Wiggers, Attys., U.S. Dept. of Justice, Washington, DC.
 Frank W. Krogh and Donald J. Elardo, Washington, DC, entered appearances for intervenor MCI Telecommunications Corp.
 Marc E. Manly, Washington, DC, entered an appearance for intervenor American Telephone and Telegraph Co.
 Before MIKVA, Chief Judge, WALD and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 On October 4, 1990, the Federal Communications Commission ("FCC" or "Commission") released its LEC Price Cap Order, 5 F.C.C. Rcd. 6786, which ushered in a new era in the regulation of major local exchange telephone carriers ("LECs"). Unlike the prior rate-of-return scheme, under which LECs were allowed to recover costs plus a designated rate of return, the price cap system, which took effect on January 1, 1991, set a rate ceiling for "baskets" of LEC services based on July 1, 1990 historical rates in order to encourage greater efficiency and to provide LECs incentives to cut costs. Southwestern Bell Telephone Company ("Southwestern"), an LEC subject to the new order, submitted a mid-course correction filing[1] to the FCC on December 4, 1990 to adjust its July 1, 1990 rate upward to account for actual costs experienced between July and November. After a lengthy process below involving two opinions and a voluntary remand order, the FCC rejected Southwestern's mid-course correction filing on the grounds that the mid-course mechanism that had prevailed under rate-of-return regulation had been supplanted by three different mechanisms for raising prices under the price cap rules, and that Southwestern had not met the particular procedural hurdles required by any of the three. The FCC also noted that, even if the former type of mid-course corrections were permissible under the new order, such filings would be reviewed under much more stringent criteria than had obtained under rate-of-return regulation--a level of review that Southwestern had also failed to satisfy in this instance.
 
 
 2
 Southwestern petitioned this court for relief, contending that the price cap order provided insufficient notice that mid-course corrections to adjust the July 1, 1990 starting points would be analyzed pursuant to a higher standard or barred altogether. We agree with Southwestern that the Commission has been less than a beacon of clarity. Nonetheless, we conclude that the price cap order, fairly read, provided sufficient notice to alert LECs that increases to the July 1, 1990 price cap that were to go into effect after January 1, 1991 could be accomplished only through [304 U.S.App.D.C. 119] the three mechanisms set forth in the order. Because we find that the order provided adequate notice of the Commission's principal contention below, we deny Southwestern's petition for review.
 
 I. BACKGROUND
 A. Regulatory Context
 
 3
 The Communications Act of 1934 requires the FCC to regulate the rates a carrier may charge for interstate telecommunications service. See 47 U.S.C. Secs. 201-205 (1988). Until 1991, the FCC employed rate-of-return regulation in setting rates for LECs. Under the rate-of-return scheme, carriers calculated rates so that projected revenues would cover projected operating expenses plus a designated return set by the FCC. The FCC required LECs to file annual tariff filings that included actual cost and revenue data for the preceding year, projections of costs and revenues for the upcoming year, and proposed rates that would attain but not exceed the authorized rate of return. See 47 C.F.R. Sec. 61.38 (1992). LECs bore the burden of proving proposed rates just and reasonable. See 47 U.S.C. Sec. 204(a)(1) (1988). In the event that an LEC's projections proved to be too high or too low during the course of the rate year, the FCC provided for mid-course corrections to make appropriate adjustments. See 47 C.F.R. Sec. 69.3(b) (1992). These mid-course filings were also evaluated according to the just and reasonable standard. See Virgin Islands Tele. Corp., 6 F.C.C.Rcd. 7350, 7351 (1991), rev'd on other grounds, Virgin Islands Tele. Corp. v. FCC, 989 F.2d 1231 (D.C.Cir.1993).
 
 
 4
 Because of the indeterminacy of figures used in rate projections, carriers "virtually never" earned precisely their authorized rate of return under rate-of-return regulation. AT & T v. FCC, 836 F.2d 1386, 1388 (D.C.Cir.1988); accord Virgin Islands Tele. Corp., 989 F.2d at 1233. Nonetheless, the FCC's mid-course correction mechanism provided a safeguard that alleviated some of the unavoidable imprecision. See id. By allowing upward adjustments in rates to account for actual costs, the FCC ensured that LEC rates would not dip far below that level necessary to achieve the authorized rate of return. Thus, we recognized in AT & T that "the gap between the actual return and the projected return may more often than not be relatively small." 836 F.2d at 1388.
 
 
 5
 On October 4, 1990, after years of debate and revision, the FCC released its LEC Price Cap Order, which fundamentally altered the system of regulating the eight major LECs. See 5 F.C.C.Rcd. 6786. Slated to go into effect on January 1, 1991, the Order replaced rate-of-return regulation with an incentive-based price cap regime designed to simulate market competition. The FCC devised the price cap order to rectify the perceived failing of rate-of-return regulation, which provided no incentive for LECs to become more efficient and productive. To set into motion the appropriate incentives, the price cap order "basketized" LEC services and limited the amount LECs could charge for these services to a fixed historical rate. The FCC reasoned that setting a price cap would exert a downward pressure on costs, catalyzing LECs to develop technological and administrative innovations in an effort to secure a more favorable rate of return. Recognizing that LECs would have every incentive to exaggerate costs to boost their initial price caps if the price cap were set prospectively, the FCC adopted a historical rate that, while concededly not perfect, represented "the best that rate of return regulation can produce." 5 F.C.C.Rcd. at 6814 (p 232). Accordingly, the FCC mandated that the starting point for price cap regulation would be those rates that the FCC had approved on July 1, 1990, subject to a minor downward adjustment in the allowable rate of return mandated in a companion order.
 
 
 6
 Under the price cap regime, the FCC accords a presumption of lawfulness to interstate rates falling at or below a price cap and within specified pricing bands for baskets of services.[2] The rules authorize three separate mechanisms by which LECs can obtain an upward adjustment of the price cap. The [304 U.S.App.D.C. 120] first, a low-end adjustment mechanism, results in an automatic increase to the price cap should an LEC's earnings drop below a 10.25% rate of return. See 5 F.C.C.Rcd. at 6788 (p 10); 47 C.F.R. Sec. 61.45(d)(1)(vii). The second, an exogenous cost mechanism, allows adjustments to the price cap for certain enumerated costs that are beyond the control of carriers--for example, costs incurred by changes in the accounting methods mandated by the FCC. See 5 F.C.C.Rcd. at 6807-10 (pp 166-190); 47 C.F.R. Sec. 61.45(d)(1). The third, an above-cap filing, allows LECs to set rates higher than the price caps if they submit extensive support materials demonstrating that, despite the low-end adjustment mechanism and opportunities to increase efficiency, their particular price cap nonetheless renders them unable to attract capital and to continue to operate. See 5 F.C.C.Rcd. at 6823-24 (pp 300-304); 47 C.F.R. Sec. 61.49(e).
 
 B. Procedural History
 
 7
 In accordance with then-prevailing rate-of-return regulations, Southwestern made a rate filing in April 1990 based on projected data for the tariff period between July 1990 and June 1991. The Common Carrier Bureau of the FCC ("CCB") permitted the LEC's proposed rates to go into effect on July 1, 1990, subject to disallowance of certain forecasted costs. On October 4, 1990, the FCC issued the LEC Price Cap Order, which required initial price cap tariff filings to be made on November 1, 1990. Southwestern complied, proposing rates that fell within its July 1, 1990 price cap.
 
 
 8
 On November 26, 1990, Southwestern determined to submit a mid-course correction filing to the FCC in order to increase its July 1, 1990 starting point to account for actual costs and revenues experienced between July and November. Southwestern applied for and received a waiver of Sec. 61.38(b)(1) of the Commission's regulations, which specifies the supporting information that must accompany a filing. The CCB emphasized that the waiver did not constitute approval of the underlying filing or prejudice any subsequent action that the Commission might undertake. See Letter from John Cimko, Chief of FCC's Tariff Division, to William A. Blase, Jr., Southwestern, Nov. 29, 1990, reprinted in Joint Appendix ("J.A.") at 4. The Commission declined to waive 47 C.F.R. Sec. 61.58, which requires advance notice of forty-five days before a tariff filing may become effective. On December 4, 1990, Southwestern submitted its proposed tariff revision to the FCC. Pursuant to Sec. 61.58, the proposed increase could take effect no earlier than January 18, 1991, two weeks after the commencement of the price cap regulations. While this application was pending, Southwestern made a supplemental filing on March 22, 1991 that sought to introduce additional data to justify an even larger rate increase than initially proposed.
 
 
 9
 In its order of April 9, 1991, the CCB rejected Southwestern's mid-course filings on the grounds that they were barred by the new price cap rules. See Southwestern Bell Telephone Co., 6 F.C.C.Rcd. 2089 (Comm.Car.Bur.1991). The CCB reasoned that the price cap order "[did] not suggest that the Commission expected to adjust the July 1 rates to fine tune rates to the authorized [rate-of-return] level." Id. at 2091 (p 20). Because Southwestern's additional costs did not qualify as exogenous under the price cap rules, the CCB determined that Southwestern's submissions constituted impermissible above-cap filings. The CCB noted further that, due to inadequate data, Southwestern's filings would also have been rejected under the prior rate-of-return regime. See id. (p 22).
 
 
 10
 On May 6, 1992, the full Commission, one member dissenting, issued a memorandum opinion affirming the CCB's decision. See Southwestern Bell Telephone Co., 7 F.C.C.Rcd. 2906 (1992). The Commission acknowledged that the price cap order left open the possibility of filing mid-course corrections to increase the initial price cap prior to the commencement of the price cap system, but stated that the order provided for a heightened scrutiny of any such filings that Southwestern could not satisfy in this instance. The Commission bolstered its conclusion rejecting the bulk of Southwestern's filing by noting that the tariff revisions were not scheduled to become effective until after the change-over to price cap regulation. See [304 U.S.App.D.C. 121] id. at 2910 (p 29). The FCC observed that Southwestern had failed to comply with the three mechanisms included in the price cap order for increases to the price cap. Despite these conclusions, the Commission ordered an upward adjustment to the price cap base rates of $6.87 million to account for anomalous data from 1986 that had erroneously been included in calculating Southwestern's growth rate in the July 1, 1990 rate-setting proceeding. See id. (pp 25-26).
 
 
 11
 On May 18, 1992, Southwestern petitioned this court for review of the Commission's order. After receiving Southwestern's opening brief, the FCC moved for voluntary remand of the case in order "to permit the FCC to give further consideration to the matters addressed in the Commission's orders, including the ultimate resolution of this case." J.A. 566. We granted the FCC's motion to remand the case in an order of October 30, 1992. The FCC released its order on remand on March 10, 1993.
 
 
 12
 In its remand order, the Commission "reaffirm[ed] its essential holding." Southwestern Bell Telephone Co., 8 F.C.C.Rcd. 2261 (1993). The FCC found that Southwestern's mid-course correction filing, which could take effect no earlier than January 18, 1991, was clearly subject to the price cap order. Because Southwestern had not complied with the requirements for any of the three upward adjustment mechanisms set forth in the price cap order, the FCC rejected its filing as patently unlawful. As an "alternate ground" for its decision, the Commission determined that, even if rate-of-return rules applied, the price order evinced the FCC's intention to evaluate mid-course filings under a more rigorous standard than had obtained prior to the order. Id. at 2263 (p 12). The FCC cited an endnote in the order for the proposition that such filings would not face "routine" treatment. Id. (p 16) (citing LEC Price Cap Order, 5 F.C.C.Rcd. at 6848 n. 315). Because Southwestern had not satisfied these more stringent criteria, the FCC determined that the filing had been properly rejected even under rate-of-return rules. Southwestern filed a timely petition for review with this court.
 
 II. ANALYSIS
 
 13
 The principal issue before us in this case is whether the FCC provided Southwestern sufficient notice in the price cap order that mid-course filings would either be barred outright in lieu of the three prescribed price-cap mechanisms or evaluated pursuant to some more rigorous standard.[3] This court most recently addressed the issue of adequate notice in McElroy Electronics Corp. v. FCC, 990 F.2d 1351 (D.C.Cir.1993), in which we held that elementary fairness requires "not ... that the agency have made the clearest possible articulation," but "only that, based on a 'fair reading' of its order, the petitioners knew or should have known what the Commission expected of them." Id. at 1358 (citing RCA Global Communications, Inc. v. FCC, 758 F.2d 722, 730-31 (D.C.Cir.1985)). The key factor for our purposes is that the order be "reasonably comprehensible to [people] acting in good faith." Maxcell Telecom Plus, Inc. v. FCC, 815 F.2d 1551, 1558 (D.C.Cir.1987) (quoting Bamford v. FCC, 535 F.2d 78, 82 (D.C.Cir.), cert. denied, 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976)). As we underscored in McElroy Electronics and reiterate here, we do not examine the reasonableness of the Commission's intended interpretation, but simply evaluate "the clarity with which the agency made that intent known." 990 F.2d at 1358. Although the agency's interpretation of its own orders is ordinarily entitled to deference, we pay strict heed to whether the agency provided affected parties with full notice of the content of those interpretations. See Satellite Broadcasting Co. v. FCC, 824 F.2d 1, 4 (D.C.Cir.1987).
 
 A. The FCC's Central Argument
 
 14
 The FCC's primary rationale in its remand order for rejecting Southwestern's mid-course filing is that the LEC Price Cap Order provides the exclusive mechanisms by which the price cap may be increased after [304 U.S.App.D.C. 122] January 1, 1991. Southwestern urges that the FCC provided no prior notice of its intent to supplant the traditional mid-course correction process with the more narrowly circumscribed procedures for raising prices set forth in the price cap order. Southwestern contends further that the FCC's original order relying on heightened scrutiny for mid-course correction filings as its basis for rejecting Southwestern's filing demonstrates that the Commission itself could not find clear notice in the order for its current position. After careful review, we find ample support for the proposition that the price cap rules set forth the exclusive mechanisms for raising price caps to account for actual costs after January 1, 1991. Because the order clearly supports the FCC's primary rationale below, we reject Southwestern's notice challenge.
 
 
 15
 The text of the price cap order patently reflects both the FCC's intention to insulate the initial price caps from carrier manipulation and the FCC's recognition that its new regulatory scheme creates tremendous incentives for carriers to engage in base-rate maneuvering. At p 230 of the order, the FCC mandates that "LEC interstate access rates, as they existed on July 1, 1990 and were adjusted by an Erratum, are the most reasonable basis from which to launch a system of price cap regulation." 5 F.C.C.Rcd. at 6814. The FCC notes at p 232 that these rates, "while perhaps not perfect, in general represent the best that rate of return regulation can produce." Id. At p 245, the FCC explains that initial price caps are set at historical levels to "prevent[ ] LECs subject to price caps from engaging in a rapid escalation in prices that would have the effect of raising their price cap base rates." Id. at 6816. Moreover, the FCC indicates in the same section that LECs may not adjust the initial price caps: "Since the elements of the [price cap] are outside the control of the carriers, and do not depend on actual prices, the price cap that LECs must adhere to on January 1, 1991 will not increase should a LEC attempt to raise prices in the interim." Id. (emphasis added). The order provides that the FCC was "not making a finding that existing rates are just and reasonable, but only that they are a reasonable starting point for price caps...." Id. at 6816 (p 241) (emphasis added). The order reasons that a broad rate-of-return proceeding aimed at identifying possible deficiencies in existing rates prior to the commencement of the price cap rules would only serve to "delay ... the introduction of more economically efficient rates." Id. (p 243). Finally, at p 189, the order rejects a proposal to allow automatic flow-through of all "extraordinary costs," reasoning that "a carrier's ability to cope with unforeseen events, yet remain competitive, is in part a function of its engineering, investment and operational decisions." Id. at 6809.
 
 
 16
 Cumulatively, these excerpts make abundantly clear the FCC's intention to abandon ordinary mid-course corrections under its new price cap regime. In the order, the FCC acknowledges the likelihood that rational LECs, like Southwestern, would be motivated to elevate their costs to obtain the highest possible price cap if price caps were set prospectively. The FCC repeatedly emphasizes that it adopted historical rates to avoid the possibility of just such manipulation. And the FCC carefully explains that, although the July 1, 1990 rates were by no means perfect, they could serve as reasonable points of departure. Repeated emphasis on the historical basis for the price cap rates and admonitions that the LECs would not henceforth be allowed to adjust the initial price cap to account for actual costs undercuts any conclusion that the FCC intended the old rate-of-return "perfecting" process to continue unabated. In its conclusion that "extraordinary costs" should not automatically translate into higher rates, the Commission manifests its clear intent that more rigorous hurdles awaited any attempt to raise prices that might potentially frustrate incentives for efficiency.
 
 
 17
 The detailed provision of three mechanisms incorporating these more rigorous hurdles reinforces our conclusion that Southwestern's position is without support in the order. These mechanisms demonstrate that the Commission was, in fact, solicitous of the argument that an unduly low price cap might translate into confiscatory rates. The procedures set forth in the order appear to balance [304 U.S.App.D.C. 123] carefully the competing considerations of efficiency and fairness, allowing LECs to charge rates in excess of the cap if no amount of intra-operation shuffling will yield a reasonable rate of return. Thus, the low-end adjustment mechanism prevents LECs from dropping below a 10.25% rate of return. See 5 F.C.C.Rcd. at 6788 (p 10); 47 C.F.R. Sec. 61.45(d)(1)(vii). The exogenous cost mechanism allows automatic adjustments to the price cap for certain extraordinary costs that are beyond the control of carriers. See 5 F.C.C.Rcd. at 6807-10 (pp 166-190); 47 C.F.R. Sec. 61.45(d)(1). Finally, the above-cap filing mechanism permits LECs to set rates higher than the price caps if they submit particular data demonstrating that they face the threat of discontinued operations. See 5 F.C.C.Rcd. at 6823-24 (pp 300-304); 47 C.F.R. Sec. 61.49(e). That the FCC sets forth three precise, albeit more limited, methods for accommodating adverse economic conditions bolsters our reading that the price cap order intended to abandon the more lenient mid-course correction system; the three new methods signify the FCC's determination that the "fairly wide latitude" in cost recovery afforded LECs under rate-of-return regulation, see 5 F.C.C.Rcd. at 6789 (p 22), could put at risk its incentive-based scheme.
 
 
 18
 As Southwestern indicates, the price cap order does make reference to mid-course corrections. However, we do not believe that the isolated instances in which that term appears undercut our conclusion that the order gave adequate notice that traditional mid-course corrections would cease after January 1, 1991. The price cap order provides that, "[d]uring the period between the July 1, 1990 date ... and the January 1, 1991 start date of price cap regulation, LECs remain free to introduce new effective prices justified under existing rate of return cost support requirements." Id. at 6816 (p 245). Rather than support Southwestern's argument, we find this statement undermines it, because the sentence is immediately followed by an avowal that
 
 
 19
 [t]o the extent LEC transmittals have the effect of increasing prices for services during this six month period, our decision to inaugurate the price cap index (PCI) on July 1, 1990 and to require actual prices to be equal to or below the PCI on January 1, 1991, prevents LECs subject to price caps from engaging in a rapid escalation in prices that would have the effect of raising their price cap base rates.
 
 
 20
 Id. Thus, although it is true that the price cap order may leave open a six-month window prior to January 1, 1991 for routine mid-course corrections, it is also clear by the terms of this order that the Commission did not contemplate that any rate increases occurring during this period would automatically raise the actual price cap for the purposes of the new regulations. Footnote 315 of the order, the meaning of which the parties vigorously dispute, provides in full that
 
 
 21
 In the Supplemental Notice, we proposed that any retargeting resulting from over- or under-earnings be treated as exogenous during the six months leading up to price caps. However, since we decided to conduct a full access filing for July 1, 1990, mid-course corrections during the six-month period leading up to price caps are likely to be premature. We will not give any such corrections routine exogenous treatment.
 
 
 22
 5 F.C.C.Rcd. at 6848 n. 315. To the extent the FCC made reference to mid-course corrections in this footnote, its reference is obscure and certainly does not clearly evidence any "business as usual" intent on the part of the Commission with respect to the use of the mid-course correction mechanism to adjust price caps. Frankly, we do not understand the import of this language, but in any case, buried as it is amid pages of endnotes, it cannot have the effect of signalling an intent to preserve the mid-course correction status quo contrary to the basic thrust of the text of the order. See McElroy Electronics Corp. v. FCC, 990 F.2d 1351, 1362 (D.C.Cir.1993) (rejecting FCC's attempt to convert single footnote into a beacon).
 
 
 23
 Southwestern also argues that the FCC's decision to adjust the price cap upward by $6.87 million to account for anomalous 1986 data used in forecasting, see Order on Remand, 8 F.C.C.Rcd. at 2261 (p 5), belies the Commission's argument that the price cap rules provided the exclusive means by which [304 U.S.App.D.C. 124] to raise the price cap. We agree that the $6.87 million adjustment was not made pursuant to any of the enumerated price cap mechanisms. However, for purposes of interpreting the price cap order, we see a crucial distinction between adjustments based on erroneous historical data and adjustments based on actual costs. The price cap order expressly disavows the view that the starting points must reflect actual costs. See 5 F.C.C.Rcd. at 6816 (p 245). The order erects rigorous mechanisms for increasing the price cap, overriding the more liberal mid-course correction mechanism, in order to forestall strategic behavior on the part of LECs anxious to obtain a little breathing room. However, in Southwestern's case, the FCC provided an adjustment for historical, not actual costs. The adjustment for pre-July 1, 1990 errors so as to ensure that the July 1, 1990 rate-setting was itself conducted correctly seems to us consistent with the order.[4]
 
 
 24
 Southwestern's final, and perhaps most significant, argument revolves around one sentence in the FCC's remand order. In its section setting forth its alternate rationale, the FCC states that "if the July 1, 1990 rates subsequently proved to be unrealistically low, the LEC Price Cap Order left open the possibility that LECs could file mid-course corrections that would increase their July 1990 rates not only during the period prior to price cap tariffs becoming effective but also thereafter." 8 F.C.C.Rcd. at 2263 (p 14) (emphasis added). Although this single sentence might indeed suggest that the order permitted ordinary mid-course corrections to raise the price cap, the paragraphs that follow retract that suggestion by announcing that the FCC considered but ultimately abandoned its original proposal to treat actual costs as routine exogenous factors under the price cap rules. Taken in context, the FCC's reference to mid-course corrections in this section, while admittedly opaque and even superficially contradictory, seems nonetheless most reasonably directed to the escape mechanisms of the new price cap scheme. Its use of key price cap language, "unrealistically low" and "exogenous costs," is more attuned to the new scheme's mechanisms than to the old. It is only the use of the old term of art "mid-course correction" that introduces the confusing note--though technically, that term could apply with equal force to attempts to raise prices under the new scheme's procedures, as well. In any case, we do not see this sentence as imperilling our central conclusion. Obviously, the FCC courts danger when it uses impenetrable, imprecise language. In this particular instance, however, given the relative clarity with which the price cap order itself mandates rejection of Southwestern's filing, we find insufficient cause for reversal.
 
 
 25
 Accordingly, we conclude that the LEC Price Cap Order adequately put LECs on notice that mid-course correction filings under traditional rate-of-return regulation would not be available to increase initial price caps after January 1, 1991. Under the clear terms of the price cap order, LECs seeking elevated starting points had to operate within the parameters of the price cap order's upward adjustment mechanisms.
 
 B. The FCC's Alternate Argument
 
 26
 After canvassing its primary justification for rejecting Southwestern's mid-course correction filing, the FCC set forth in its remand order what it characterized as an "alternate ground" for the result. See 8 F.C.C.Rcd. at 2263 (p 12). The FCC rebutted [304 U.S.App.D.C. 125] Southwestern's contention that ordinary rate-of-return rules should apply by arguing that, even if mid-course corrections were feasible under the price cap order, footnote 315 notified LECs that much more rigid scrutiny of such corrections would obtain. Southwestern assails this "much more rigid scrutiny" as utterly without content. We decline to pass on the merits of the FCC's second justification, because the FCC's clear primary rationale has obvious support in the price cap order, and it is evident that the "alternate ground" of heightened scrutiny is subordinate and offered solely to rebut specific arguments of Southwestern.
 
 III. CONCLUSION
 
 27
 For the foregoing reasons, we deny Southwestern's petition for review of the order dismissing its mid-course correction filing for failure to comply with the price cap rules. The LEC Price Cap Order adequately communicates the FCC's intention to steer a new course and to evaluate attempts to raise price caps after January 1, 1991 pursuant only to the mechanisms set out in the price cap scheme itself.
 
 
 28
 It is so ordered.
 
 
 
 [1]
 The term "mid-course correction filing" generally refers to an LEC's proposed rate adjustment to account for actual costs experienced under rate-of-return regulation that deviate from cost projections employed in initial rate-setting proceedings. As described below, the FCC appears also to use "mid-course correction filing" more broadly to refer to any mid-stream rate adjustment, whether under rate-of-return or price cap regulations
 
 
 [2]
 In National Rural Telecom Ass'n v. FCC, 988 F.2d 174 (D.C.Cir.1993), we upheld the price cap order's "baskets," profit-sharing mechanisms, and streamlined tariff review procedures for below-cap filings against a substantive APA challenge
 
 
 [3]
 Southwestern concedes that it did not comply with the requirements of the three price-cap mechanisms
 
 
 [4]
 In connection with this argument, Southwestern also contends that the FCC perpetrated systematic bias by allowing price cap adjustments downward without adhering to the three price cap mechanisms prescribed by the order when investigations revealed the price caps to be unlawfully high. Southwestern cites to our opinion in AT & T v. FCC, 836 F.2d 1386 (D.C.Cir.1988), for support. AT & T rejected total asymmetry in the Commission's refund rules, which required refunds for utility earnings above the prescribed rate of return but did not allow any method of recovering for shortfalls. We fail to see any analogous evidence of "systematic bias" in the FCC's order. The FCC devised its scheme cognizant of the tremendous incentives facing LECs to inflate their price caps. If price caps were set too high, the FCC reasoned, LECs would have little impetus to streamline their operations. Absent any indication that increases were barred altogether, we do not see any objectionable bias in the FCC's effort to erect more rigorous hurdles for LECs intent on raising their price caps in order to safeguard the objectives of its new regulatory regime